IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 17-3020-01-CR-S-MDH |
| | ) | |
| ADAM E. BILLINGS, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S SENTENCING MEMORANDUM AND
### MOTION FOR DOWNWARD DEPARTURE AND/OR VARIANCE

Comes now Defendant, Adam E. Billings, by counsel, Ian Lewis, Assistant Federal Public Defender, and respectfully asks this Court to sentence Mr. Billings to a sentence of 15 years (180 months).

*I. Brief Case and Procedural History*

On October 24, 2017, Mr. Billings entered a plea of guilty to the Indictment herein pursuant to a plea agreement. In that plea agreement, the Government admits that Mr. Billings is entitled to the full three-point reduction for acceptance of responsibility and the defense agreed to recommend a sentence of 15 years.

The Presentence Investigation Report (hereafter "PSR") stated a total offense level of 35 and a criminal history category of VI, yielding a guideline imprisonment range of 292 to 365 months as to the offense. *See*, PSR ¶ 57. However, as is documented in the January 31, 2018, Addendum to the PSR, Mr. Billings objects to such calculations. Mr. Billings objects to a level 36 being used for the U.S.S.G. base offense level (1.5kg to 4.5kg (actual)). The use of this amount of controlled substance is based on speculation. *See*, PSR Addendum and ¶¶ 3-8. The nature of the calculation may be "conservative" to the PSR writer; however, there is nothing in the factual

1

record to support making all 2.2 kg "actual" methamphetamine. *See*, PSR (Addendum) at pgs. 17-18. If the calculations utilized this same speculative calculation as to quantity, but did **not** speculate on the purity of the 2.2 kg, the U.S.S.G. base offense level would begin at 32, which Mr. Billings believes to be a proper starting point in light of the "ghost" nature of the methamphetamine being considered. *Id*.

However, defendant believes that if a sentence is imposed within either the PSR calculated Guidelines range or the Guidelines range proffered by defendant[1] that such would be a sentence greater than necessary for these circumstances and greatly disparate to the sentences imposed upon other defendants recently in the Western District of Missouri where the nature and circumstances of the controlled substances offenses were much more severe and pervasive as to the public than the circumstances here. *See*, *U.S. v. Jerry Wright*, Case No. 14-03054-01-CR-S-BP (defendant was a career offender with multiple federal controlled substance conspiracy convictions as a leader/manager who received a 240 month total sentence); *U.S. v. Cesar Ramon Avila-Hernandez*, Case No. 14-03054-04-CR-S-BP (defendant was already on probation from the state of California for controlled substance charges and did not accept responsibility, but went to trial, and thereafter received a 240 month total sentence); *U.S. v. Gregory M. Holcomb*, Case No. 10-03069-11-CR-S-GAF (240 month sentence when defendant had multiple prior large conspiracies in multiple states and firearms charges and absconded after charges were filed); *U.S. v. Gerardo Hernandez Cazares, Sr.* and *Gerardo Hernandez, Jr.*, Case No. 15-05036 (defendants were convicted in large drug conspiracy with certain counts including a mandatory 60 month consecutive sentence and sentences totaling 120 months and 180 months were imposed); *U.S. v. Marlon Dion Jordan*, Case

---

[1] Mr. Billings submits that the proper Guidelines range should be based on a total offense level of 31 and a criminal history category of VI for a Guidelines range of 188-235.

No: 14-04065-04-CR-C-SRB (defendant had a criminal history category of VI and was convicted in a large cocaine distribution conspiracy as the number four defendant and was sentenced to 151 months).

## II. Sentencing Factors in 18 U.S.C. § 3553(a)

### A. The Nature and Circumstances of the Offense and the Need to Avoid Unwarranted Sentence Disparities – 18 U.S.C. § 3553(a)(1) and (6).

In each of these comparison cases cited above, the total offense level prior to Chapter Four Enhancements was 38 or above given the amount of controlled substances involved in the charges. In this case, it is 38 or below depending on this Court's determination of Mr. Billings' objection to the base offense level. Moreover, there are no allegations of multi-state, drug cartel, large scale activities as there was in most of those cases. There is no prior conviction in federal court, which would have already allowed several of those defendants to have benefitted from the tremendous BOP programs available, both substance abuse and mental health treatment (that this defendant wants and will benefit from) for example. To impose a sentence at or above any of those sentences would be disparately greater than what is called for here by the nature and circumstances of **this** offense and this defendant's history and characteristics.

According to the study, *Average Sentences of Drug Trafficking Offenders (Career Offender and Non-Career Offender)* by the U.S. Sentencing Commission, such statistics being obtained from their 2005-2014 Monitoring Datasets, the most recent median sentence imposed for drug trafficking *career offenders* is 130 months. Accordingly, if 130 is the median of all offenders, Mr. Billings' request of a sentence of 180 months is a reasonable sentence and request.

### B. The History and Characteristics of the Defendant - 18 U.S.C. § 3553(a)(1).

#### 1. The Defendant's Drug Addiction began at an early age.

In PSR ¶¶ 47-48 Mr. Billings' extraordinary history of drug addiction is summarized. What is unusual is the how early his addiction to illicit controlled substances began, 12 years old. His susceptibility to such an addiction (and the actions to support such) was obviously influenced by his age and immaturity. As quoted by the Court in *Gall v. United States*, 128 S.Ct. 586, 601 (2007), "…youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage…. "

The rational part of the human brain is not fully developed "until the age of 25 or so."[2] Studies have shown that this fact is complicated in a child who starts using illicit drugs at age 12.[3] Moreover, the brain changes that occur over time challenge an addicted person's self-control and hamper his or her ability to resist intense impulses to take drugs.

> Drugs contain chemicals that tap into the brain's communication system and disrupt the way nerve cells normally send, receive and process information. There are at least two ways that drugs cause this disruption: (1) by imitating the brain's natural chemical messengers and (2) by overstimulating the 'reward circuit' of the brain. . . .
>
> As a person continues to abuse drugs, the brain adapts to the overwhelming surges in dopamine by producing less dopamine or by reducing the number of dopamine receptors in the reward circuit. The result is a lessening of dopamine's impact on the reward circuit, which reduces the abuser's ability to enjoy the drugs, as well as the events in life that previously brought pleasure. This decrease compels the addicted person to keep abusing drugs in an attempt to bring the dopamine function back to normal, except now larger amounts of the drug are required to achieve the same dopamine high—an effect known as *tolerance*.

---

[2] University of Rochester Medical Center, *Understanding the Teen Brain*, https://www.urmc.rochester.edu/encyclopedia/content.aspx?ContentTypeID=1&ContentID=3051.

[3] *See*, National Center for Biotechnology Information, U.S. National Library of Medicine, National Institutes of Health, Squeglia, Jacobus and Tapert, *The Influence of Substance Use on Adolescent Brain Development*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2827693/.

4

> Long-term abuse causes changes in other brain chemical systems and circuits as well. Glutamate is a neurotransmitter that influences the reward circuit and the ability to learn. When the optimal concentration of glutamate is altered by drug abuse, the brain attempts to compensate, which can impair cognitive function. Brain imaging studies of drug-addicted individuals show changes in areas of the brain that are critical to judgment, decision-making, learning and memory, and behavior control. Together, these changes can drive an abuser to seek out and take drugs compulsively despite adverse, even devastating consequences—that is the nature of addiction.

*See* National Institute on Drug Abuse, *Drug Facts: Understanding Drug Abuse and Addiction,* https://www.drugabuse.gov/sites/default/files/understanding.pdf, pp. 2-3.

In 2014, a district court case out of Iowa articulated the correlation between addiction and lack of true culpability very eloquently:

> 'When science began to study addictive behavior in the 1930s, people addicted to drugs were thought to be morally flawed and lacking in willpower. Those views shaped society's responses to drug abuse, treating it as a moral failing rather than a health problem, which led to an emphasis on punitive rather than preventative and therapeutic actions. Today, thanks to science, our views and our responses to drug abuse have changed dramatically.' Nora D. Volkow, Preface to National Institute on Drug Abuse, Drugs, Brains, and Behavior: The Science of Addiction 1(2010), *available at* https://www.drugabuse.gov/publications/drugs-brains-behavior-science-addiction/preface.
>
> As a federal judge with two decades of experience sentencing drug-addicted criminal defendants, the quote above, from the director of the National Institute on Drug Abuse, evokes both optimism and dismay. On one hand, it reflects society's progress in understanding addiction as a public-health problem. On the other hand, it is a sobering reminder that advances in science continue to outpace advances in law. While science may have changed our views on drug abuse, the law still responds to drug abusers with punitive force, rather than preventative or therapeutic treatment. It is therefore unsurprising that, since 1980, the number of federal prisoners serving drug-related sentences has skyrocketed. In short, the quote above speaks to how far we've come, and how far we've yet to go.

*United States v. Hendrickson*, 25 F. Supp. 3d 1166, 1168–69 (N.D. Iowa 2014) (finding that drug addiction is mitigating, especially in cases "where the defendant is both young and has been addicted to drugs throughout adolescence and most of his early adulthood.").

5

In *Hendrickson*, Judge Bennett noted that the defendant had struggled with addiction since age 14, abusing both marijuana and methamphetamine. *Id.* at 1171. Judge Bennett acknowledged, "[a]s a result of scientific research, we know that addiction is a disease that affects both brain and behavior." *Id.* (citing Drugs, Brains, and Behavior, *supra*, at 1). "Addiction is defined as a chronic, relapsing brain disease that is characterized by compulsive drug seeking and use, despite harmful consequences." *Id.* at 1172. "[W]hile addiction was once thought of as merely a moral failure, it is now rightly identified as a serious medical condition." *Id.* Judge Bennett recognized that drugs altered the way the brain works and pointed out that a study "suggest[ed] that drug abuse damages a person's orbitofrontal cortex (OFC)—the brain region responsible for evaluating hasty decisions—impairing the person's judgment, especially regarding a decision's long-term consequences." *Id.* (citing Rick Nauert, *How Drugs Hijack Decision- Making in the Brain, Psychcentral* (Nov. 27, 2012).[4] Thus, this is why addicts often appear oblivious to the consequences of their actions, causing them to ignore future consequences. *Id.* at 1173. "Taken together, this scientific evidence speaks to a fundamental issue at sentencing: culpability. . . . By physically hijacking the brain, addiction diminishes the addict's capacity to evaluate and control his or her behaviors. . . . The capacity to evaluate the consequences of one's actions is central to one's culpability." *Id.* at 1173-74. Judge Bennett noted that the defendant in *Hendrickson* was young and had been addicted to drugs since age 14, during the time when his brain was still developing.

Mr. Billings' drug use began at 12-years-old, even earlier than the defendant in *Hendrickson*. "Although taking drugs at any age can lead to addiction, research shows that the

---

[4] http://psychcentral.com/news/2012/11/27/how-drugs-hijack-decision-making-in-the-brain/48162.html.

earlier a person begins to use drugs, the more likely he or she is to develop serious problems." *See,* National Institute on Drug Abuse, *Drugs, Brains, and Behavior; The Science of Addiction*, https://www.drugabuse.gov/publications/drugs-brains-behavior-science-addiction/drug-abuse-addiction. Introducing drugs during development may cause brain changes that have profound and long-lasting consequences by disrupting "brain function in areas critical to motivation, memory, learning, judgment, and behavior control." *Id.* "So, it is not surprising that teens who use alcohol and other drugs often have family and social problems, poor academic performance, health-related problems (including mental health), and involvement with the juvenile justice system." *Id.*

Defendant currently is not the person he was as a 12-year-old when his addiction began. He is now 43-years-old. He knows that his life patterns must change. He knows that he will be at least approaching 60-years-old when he is released from prison, if the Court accepts his request for a 180-month sentence.[5] Because of the isolation from controlled substances that he has received since his incarceration, he has the clarity to know that he must take advantage of Bureau of Prison programs such as RDAP to have the skills to handle his addiction and become long-term drug free. With Mr. Billings' gaining maturity and the rehabilitative programs that BOP can provide him (that he has not experienced before), he will have the tools post-incarceration to succeed in building a new life for himself.

---

[5] If a PSR (¶ 57) Guidelines range sentence is imposed within the 292-365 month range it will most likely constitute a de facto life sentence for Mr. Billings. According to the Social Security Administration, Mr. Billings is expected to live for 34.95 more years. A sentence in the range of thirty years, three decades, will be most, or all, of his remaining life expectancy. *See,* Social Security Actuarial Life Table at: https://www.ssa.gov/oact/STATS/table4c6.html. Such a sentence is thus, possibly a de facto life sentence given that mortality rates for prisoners is less than the general population.

7

### 2. *The Defendant's drug addiction is the catalyst for all of his criminal history.*

A review of Mr. Billings' criminal history reveals that his drug addiction has been the catalyst for his offenses. *See*, PSR ¶¶ 25-31. Almost all of the offenses were committed in the pursuit of possessing controlled substances and/or selling controlled substances in order to support and fuel his addiction. Even the offenses in PSR ¶ 31 were committed to financially support himself during his drug addictive behavior.

As the Court observed in *United States v. Perella*. 273 F. Supp.2d 162, 164 (D.Mass. 2003), if drug addiction creates a propensity to crime (as in this defendant's case[6]), drug rehabilitation goes a long way to preventing recidivism. Statistics suggest that the recidivism rate is less for drug offenders who receive treatment while in prison or jail, and is still even less for those treated outside of a prison setting. *See*, Lisa Rosenblum, *Mandating Effective Treatment for Drug Offenders*, 53 Hastings L.J. 1217, 1220 (2002).

## **CONCLUSION**

Defendant, Mr. Billings, respectfully requests that this Honorable Court:

1. Sustain Mr. Billings' objections to the PSR;

2. Grant his Motion for Downward Departure/Variance to a sentence of 180 months; and

3. Recommend to the Bureau of Prisons that Defendant be allowed to participate in their Residential Drug Abuse Program ("RDAP").

---

[6] *See*, PSI ¶¶ 25-31.

Respectfully submitted,

*/s/ Ian A. Lewis*
**IAN A. LEWIS, #52819**
Assistant Federal Public Defender
901 St. Louis Street, Suite 801
Springfield, Missouri 65806
(417) 873-9022
Attorney for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of April, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which sent e-mail notification of such filing to all CM/ECF participants in this case, and a copy was mailed, via the United States Postal Service, to all non-CM/ECF participants.

*/s/ Ian A. Lewis*
**IAN A. LEWIS**